**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **GUY CARPENTER & COMPANY, LLC,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | |
| **HOWDEN REINSURANCE BROKERS LIMITED, HOWDEN REINSURANCE BROKERS (US) LLC,** | § § § § § | **CIVIL ACTION NO. _____** |
| *Defendants.* | § § § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Guy Carpenter & Company, LLC ("Guy Carpenter"), by and through its undersigned counsel, files this Original Complaint against Defendants Howden Reinsurance Brokers Limited ("Howden") and Howden Reinsurance Brokers (US) LLC ("Howden US"), and alleges as follows:

## I.    INTRODUCTION

1.    This action arises out of Howden's orchestration of what one leading trade publication described as an "audacious raid" of GC Access, a successful business unit of leading international reinsurance broker Guy Carpenter.  Having had no previous presence in the market served by GC Access, rather than invest its own time and resources to develop one, Howden simply ripped out the majority of the GC Access team to compete directly with Guy Carpenter.  Howden orchestrated the simultaneous defection of twelve GC Access employees, including its top leadership, and over twenty program accounts with GC Access clients worth millions of dollars in annual revenue, to instantly create a mirror image business to the one Guy Carpenter had invested

to build over the past five years.  The scheme culminated in Howden executives Elliot Richardson and Charlotte Hubble hosting a group meeting of departing Guy Carpenter employees, in a private room of an upscale Dallas restaurant, where Howden oversaw the simultaneous resignations of the defecting employees.  As explained herein, this coordinated raid was more than just audacious— it was tortious.  Howden, through Richardson and Hubble, directly and knowingly participated in and induced the defecting Guy Carpenter employees to persuade their colleagues to work for Howden while *still employed by* Guy Carpenter, to persuade clients to move their business to Howden, and to pilfer Guy Carpenter's confidential information, all in violation of their ongoing fiduciary duties and contractual obligations to Guy Carpenter—including duties under Texas, New York, and federal law.

      2.      In 2021, Howden had no U.S. presence in the specialized Managing General Agent ("MGA") reinsurance broker business in which GC Access is an established industry leader.  Guy Carpenter built GC Access's leadership position in the MGA market through many years, and millions of dollars, of focused investment.  But rather than similarly investing to build, organically, a practice of its own, Howden opted instead to brazenly appropriate the business Guy Carpenter had built from the ground up.  To that end, Howden set its sights on luring away the leadership of GC Access, including its then President and Managing Director Michael Jameson, and key leaders, Matthew Beard, Kenneth Durbin, Zachary Wilson, and Kyle Goeke (collectively, the "Departing Senior Employees").  But luring away the Departing Senior Employees was not enough.  In order to operate, Howden needed an *entire team* replicating from top to bottom the business Guy Carpenter had built with GC Access.  To achieve that, Howden encouraged and coordinated with the Departing Senior Employees to identify and recruit as many top-performing employees as possible, and to provide Howden with confidential personnel and compensation information about

those employees, all while knowing such activity was in violation of the Departing Senior Employees' duties to Guy Carpenter.

3.      The raid of Guy Carpenter's personnel was revealed on April 25, 2022.  Howden's Chair, Richardson, and Head of HR Strategy and Transformation for Howden Group Holdings, Hubble, had flown in from England to Dallas to oversee personally the culmination of the raid. The morning of April 25, Richardson and Hubble organized a gathering in a private room at the Mansion on Turtle Creek, a high-end hotel and restaurant in Dallas.  At this meeting, the Departing Senior Employees worked together with Howden's Richardson and Hubble to make their final push to encourage the group to resign from Guy Carpenter and join Howden.  Once they were in agreement to do so, Hubble, Richardson, and the Departing Senior Employees advised the other departing employees on the content of and process for submitting resignation emails to Guy Carpenter.  Following this, each of the twelve Guy Carpenter employees that moved to Howden tendered near-simultaneous resignations to Guy Carpenter.[1]  Later that evening, this same group—including Richardson and Hubble—met to celebrate the raid of the GC Access unit at Au Troisième, a Dallas restaurant that had not yet opened to the public, and in which Jameson was an investor.  This carefully calculated raid, cherry-picking more than half of the GC Access team and utilizing confidential details about their employment with Guy Carpenter to entice them to leave, constituted a clear violation of the contractual and fiduciary duties that the Departing Senior Employees owed to Guy Carpenter.  And Howden, acting through Richardson, Hubble, and others, assisted, encouraged, and knowingly participated in these violations every step of the way.

---

[1]   One departing employee, Oliver Ferrari, was based out of London and resigned slightly before the other Guy Carpenter employees.  Ferrari did not attend these gatherings in Dallas with Howden and the eleven U.S.-based departing employees.

4.     As part of this orchestrated raid, the following Guy Carpenter employees (collectively "the Departing Employees") defected from Guy Carpenter to Howden:

- Michael Jameson – President, Managing Director (Dallas)
- Matthew Beard – Managing Director (Dallas)
- Kenneth Durbin – Senior Vice President (Dallas)
- Zachary Wilson – Senior Vice President (Atlanta)
- Kyle Goeke – Senior Vice President (Dallas)
- James Matusiak – Senior Vice President (Dallas)
- Oliver Ferrari – Senior Vice President (London)
- Andrew Hardee – Vice President (Dallas)
- Benjamin Williams – Vice President (Dallas)
- Barrett Skeeter – Assistant Vice President (Dallas)
- Bennett Brock - Risk Analyst in the Brokering Department (Dallas)
- Mayda Arista – Technical Support Assistant (Dallas)

5.     Howden and the Departing Senior Employees' solicitation of Guy Carpenter employees did not end with this coordinated group resignation, or even after those employees were formally terminated by Guy Carpenter about one month later.[2]  Howden and the Departing Senior Employees continued their efforts to solicit current Guy Carpenter employees who did not resign on April 25 well after the raid through communications with these employees.  For example, on June 9, 2022, after a night of apparent partying, Jameson and a group of the other Departing Senior Employees called a current Guy Carpenter employee to tell him that he should come to Howden and to ask why he was still at Guy Carpenter.  By inducing Jameson and the other Departing Senior Employees to continue to solicit Guy Carpenter employees, Howden is blatantly encouraging these individuals to violate legal duties owed to Guy Carpenter.

6.     Nor was Howden's raid limited to just Guy Carpenter's employees.  It also targeted established GC Access clients that the Departing Senior Employees solicited both while they were

---

[2]   Nearly all Departing Employees had contractual notice periods of 60 days, requiring them to remain Guy Carpenter employees following their simultaneous resignations until the earlier of the end of the 60-day period or a prior date of Guy Carpenter's choosing.

still employed by Guy Carpenter and afterward.  In fact, ***the day the raid occurred***—April 25, 2022—a current Guy Carpenter client attending the Auto Insurance Report National Conference in Dana Point, California bragged that she had "known about this [*i.e.*, the raid] for weeks" because Durbin had been talking to her about the imminent move and asking her to move her business to Howden.  And ***the day after the coordinated raid***—April 26, 2022—one of Guy Carpenter's longstanding clients, whose main contact at Guy Carpenter was Jameson, announced that it was moving all of its business to Howden.  Since then, other Guy Carpenter clients have followed suit, announcing plans to move their business to Howden, resulting in millions of dollars in lost revenue for Guy Carpenter.  This appears to be the fruition of Howden's plan all along—instantly to create a new Dallas-based MGA practice, to be housed in the newly-formed Texas business entity Howden US, using the talent, client base, and confidential information stolen from Guy Carpenter.

7.     Stealing Guy Carpenter's employees and clients in such a coordinated manner would be impossible without use—or more aptly, misuse—of Guy Carpenter's confidential information and trade secrets, including but not limited to, personnel information and sensitive client data, which is and was protected from disclosure pursuant to the Departing Senior Employees' contracts with Guy Carpenter.  The Departing Senior Employees misappropriated this confidential information at the direction and for the benefit of Howden and Howden US.  Among other examples, Jameson stole confidential trade secret information for Howden and Howden US through uploading files to a third-party cloud server; days before resigning Beard misappropriated confidential Guy Carpenter presentations; and Durbin—just a few days before resigning from Guy Carpenter—reviewed and misappropriated highly confidential information about prospective Guy Carpenter business opportunities and expected revenue tied to those opportunities.

8.     The illicit scheme between Howden, Howden US, and the Departing Senior Employees could not be more transparent.  As Ferrari told Goeke after meeting with Howden to plan the raid (a communication that Ferrari attempted to delete, but which Guy Carpenter restored), the plan was to "make it work" if "all together" Howden and the Departing Senior Employees conspired to execute the move.  And Howden and Howden US were willing to do "whatever it takes to make it work," including participating in and encouraging breaches of legal duties and misappropriating highly confidential, trade secret Guy Carpenter information.

```
Timestamp: 23-Feb-22 2:25:33 PM(UTC+0)
Source App: WhatsApp
Body:
I think we have to appreciate that there will always be an element of the unknown
going into this but from what I understand they get that and are willing to do
whatever it takes to make it work. Nothing will be perfect day one but all together
we can make it work the right way
-----------------------------
```

## II.    PARTIES

9.     Guy Carpenter is a Delaware limited liability company whose sole member is Marsh USA Inc., a Delaware Corporation, with its principal place of business in New York, New York.  Guy Carpenter maintains an office in Dallas, Texas.  Ten of the Departing Employees worked in Guy Carpenter's Dallas, Texas office.  One Departing Employee—Zachary Wilson—worked in Guy Carpenter's Atlanta, Georgia office (together, the "U.S. Departing Employees").  The final Departing Employee—Oliver Ferrari—worked in Guy Carpenter's London, United Kingdom office.

10.     Defendant Howden Reinsurance Brokers Limited is a business entity organized and existing under the laws of England and Wales, with its principal place of business located in London, England.

11.     Defendant Howden Reinsurance Brokers (US) LLC is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business located in Dallas, Texas.

## III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises in part under federal law—the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

13.     This Court has supplemental jurisdiction over Guy Carpenter's state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

15.     This Court has personal jurisdiction over Defendant Howden US because it is organized and exists under the laws of the State of Texas and has its principal place of business in the State of Texas.

16.     This Court has personal jurisdiction over Defendants Howden and Howden US because they have purposefully availed themselves of the privilege of conducting activities in the State of Texas and invoked the benefits and protections of its laws; Defendants Howden and Howden US have established minimum contacts sufficient to confer jurisdiction over them; the claims relate in part to Defendants Howden and Howden US's activities and conduct related to and taking part in the State of Texas, and the assumption of jurisdiction over Defendants Howden and Howden US will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

17.     Specifically, and as alleged in further detail herein, Defendant Howden, acting by and through its employees and agents including but not limited to Richardson and Hubble:

a.   Initiated and engaged in telephone, text message, and email communications with the Departing Employees who live and work in the State of Texas, which includes all Departing Employees except Zachary Wilson who resides and works in Georgia, and Oliver Ferrari, who resides and works in London, United Kingdom, for the purpose of soliciting and offering them employment in the State of Texas with Howden US;

b.   Knowingly participated in the Texas-based Departing Employees' breaches of fiduciary duties, breaches that occurred primarily in the State of Texas;

c.   Tortiously interfered with the Texas-based Departing Employees' performances of their contracts in Texas with Guy Carpenter resulting in the Texas-based Departing Employees' breaches of those contracts, with those breaches occurring primarily in the State of Texas;

d.   Conspired with the Departing Employees, with significant acts related to the hatching and carrying out of the conspiracy taking place in Texas;

e.   Established Howden US, a Texas limited liability company with a principal place of business in Dallas, Texas, for the specific purpose of employing the Departing Employees, including the Texas-based Departing Employees who all continue to work and reside in Texas; and

f.   Physically traveled to Dallas, Texas to finalize, oversee, and be present for the Departing Employees resignations from Guy Carpenter.

18.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1), because Defendant Howden US maintains its principal place of business in Dallas, Texas, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts or omissions giving rise to the claims occurred in Dallas, Texas.

## IV.   STATEMENT OF FACTS

**A.     Guy Carpenter Invests in and Builds the GC Access Business Unit into a Leader in the Managing General Agent Market**

19.     Guy Carpenter is a leading international reinsurance broker that provides an array of services for its clients including reinsurance broking, capital solutions, strategic advisory services, and analytics.

20.     The Departing Employees worked in a business unit at Guy Carpenter known as "GC Access," which is Guy Carpenter's dedicated Managing General Agent, or MGA, platform. Over the past five years, Guy Carpenter has invested significant time, millions of dollars, and substantial resources to build the GC Access business unit into a leader within its niche market and to develop and train the employees within the unit.

21.     After years of strategic positioning and significant investment in the MGA market, Guy Carpenter launched GC Access in 2020 to provide fully integrated services to MGAs, including carrier and reinsurance transactions, captive support, insurtech expertise, and program startup roadmaps.  GC Access helps clients develop fully optimized program solutions, combining focused expertise, market-leading analytical capabilities, global reach, and an expansive network of insurer and reinsurer relationships to precisely and efficiently match MGAs and carriers. Significantly, prior to April of this year, Howden had no similar presence in the US MGA market.

22.     Prior to the raid, approximately 20 Guy Carpenter employees, including the Departing Senior Employees, were primarily dedicated to the GC Access platform.  As part of this specialized group, those employees benefitted from extensive training, client development resources, and cross-selling provided to them by Guy Carpenter.  All twelve of the Departing Employees provided services to the GC Access unit, meaning Howden's coordinated raid stole the

majority of the employees in the group (and Howden and the Departing Senior Employees together tried unsuccessfully to recruit several of the remaining members of the GC Access group).

23.    Employees in GC Access utilize Guy Carpenter's global reach and confidential company and industry knowledge to build their niche practice.  Accordingly, the employees within this business unit have access to significant commercially sensitive and confidential information. This includes information about clients, prospective clients, growth opportunities, pricing, and terms and conditions of contracts with clients.  These employees also have intimate knowledge of confidential and proprietary information about GC Access's workforce, including employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients.

24.    This commercially sensitive and confidential information is vital to the success of GC Access, as information about prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry.  Such detailed, proprietary market research and analytics provide Guy Carpenter with significant competitive advantages.  Guy Carpenter went to great lengths at enormous expense to collect and refine this market data and other information to benefit its business relative to competitors, giving it a strong competitive advantage.

25.    GC Access employees also have access to a number of confidential and trade secret proprietary tools, used for business analytics and actuarial services.  For example, certain of the Departing Employees utilized a Guy Carpenter-developed program called MetaRisk, which is part of an end-to-end suite of risk assessment and capital modeling tools, offering analytics related to underwriting, reserving, catastrophe, credit, and investment risk.  MetaRisk and other proprietary Guy Carpenter analytics and actuarial tools allow GC Access the proprietary ability to synthesize

and analyze confidential information from various sources including client business plans, financial records, performance metrics, balance sheets, and other sensitive client business records.

26.     Guy Carpenter has made significant efforts to ensure that employees and former employees do not use or disseminate confidential information or trade secrets for the benefit of competitors.   Among other measures, Guy Carpenter requires all employees to sign various agreements and policies to protect such information.

**B.     The Departing Senior Employees Owed Contractual and Fiduciary Obligations to Guy Carpenter Relating to Its Employees, Clients, and Other Confidential Information**

27.     To protect its essential investments in its employee and client relationships and to safeguard the confidentiality of its other trade secrets and proprietary information, Guy Carpenter entered into a series of industry-standard Notification, Non-Solicitation and Confidentiality Agreements with each of the Departing Senior Employees (the "Agreements").   The Agreements are governed by New York law, and are attached hereto as Exhibits A–E.[3]

**Non-Solicitation of Clients and Employees**

28.     Under the Agreements, the Departing Senior Employees have clear and straightforward obligations to protect Guy Carpenter's legitimate business interests, including the confidentiality of Guy Carpenter's proprietary information and/or trade secrets, knowledge of Guy Carpenter's business practices, and goodwill with clients.[4]

---

[3]     As Exhibits A–E make clear, there are multiple versions of the Departing Senior Employees' Notification, Non-Solicitation and Confidentiality Agreements, which contain substantially the same restrictions.

[4]     The other Departing Employees also have identical or substantially similar contractual duties to Guy Carpenter.   Although Guy Carpenter focuses here on Defendants' interference with the Departing Senior Employees' contractual obligations, it reserves all rights with respect to the contractual obligations of the remaining Departing Employees.

29. In the Agreements, the Departing Senior Employees each agreed to be bound by a non-solicitation covenant prohibiting the solicitation of Guy Carpenter clients and employees for a period of one year following their termination of employment.

30. In particular, Departing Senior Employees Jameson, Beard, Durbin, and Wilson each agreed to be bound by the following non-solicitation covenant prohibiting direct or indirect solicitation of Guy Carpenter clients and employees:

Non-Solicitation of Company Business and Employees

(a)  Employee agrees that if his/her employment with the Company terminates for any reason (regardless of whether such termination is voluntary or involuntary), s/he will not, for a period of one (1) year from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(i)  solicit or accept business of the type offered by the Company during his/her term of employment with the Company, or perform, participate in, or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by Employee or where s/he supervised or participated in, directly or indirectly, in whole or in part, the solicitation of servicing activities related to such clients or prospects within two (2) years prior to his/her termination of employment; or (ii) any former client of the Company or its affiliates who was a client within two (2) years prior to my termination and who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(ii)  solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company or its affiliates to terminate his or her employment with the Company or such affiliate, as applicable, for any reason.

(b)  As used in Section 2(a)(i), "prospects" shall mean any prospective client or customer who Employee solicited, participated in the solicitation of, or supervised the solicitation of at any time during the twelve (12) months preceding the termination of his/her employment.

Exs. A–D (Jameson, Beard, Durbin, Wilson) § 2.

31.     Departing Senior Employee Goeke agreed to be bound by a substantially similar non-solicitation covenant prohibiting the direct or indirect solicitation of Guy Carpenter clients and employees:

<u>Non-Solicitation of Company Business and Employees</u>

(a)  Employee agrees that if his or her employment with the Company terminates for any reason (regardless of whether such termination is voluntary or involuntary), he or she will not, for a period of one (1) year from date of termination, directly or through others, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(i)  solicit or accept business of the type offered by the Company during his or her employment with the Company, or perform, participate in, or supervise the performance of any services related to such type of business, from or for (a) clients or prospects of the Company or its affiliates who were solicited or serviced directly by Employee or where he or she supervised or participated in, directly or through others, in whole or in part, the solicitation of servicing activities related to such clients or prospects; or (b) any former client of the Company who was solicited or serviced directly by Employee or where Employee supervised or participated in, directly or through others, in whole or in part, the solicitation or servicing activities related to such former clients; or

(ii)  solicit, induce, or encourage, or assist others in soliciting, inducing, or encouraging, any employee of the Company with whom Employee, during the last two (2) years prior to separation from employment with the Company, came into contact for the purpose of soliciting or serving business or about whom Employee obtained Confidential Information and Trade Secrets to terminate his or her employment with the Company for any reason.

(b)  The restriction in Section 2(a)(i)(a) shall only apply to those clients or prospects of the Company with whom Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the two (2) years prior to separation from employment with the Company.

(c)  The restriction in Section 2(a)(i)(b) shall apply only to those former clients of the Company with whom Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the two (2) years prior to separation from employment with the Company.

Ex. E (Goeke) § 2.

---

**Non-disclosure of Confidential Information and Trade Secrets**

32.     The Departing Senior Employees also agreed to be bound by substantially similar provisions prohibiting the use or disclosure of confidential information[5] either before or after the end of the their employment with Guy Carpenter:

Nondisclosure of Confidential Information

During the period Employee is employed by the Company, Employee agrees that, unless authorized in writing to do so by the chief executive officer of the Company, s/he will not, directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out his/her duties as an employee of the Company.  After termination of his/her employment by the Company, Employee will not, directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information.

Exs. A–D, (Jameson, Beard, Durbin, Wilson) § 3; *see also* Exs. E (Goeke) § 3 (similar).

**Return of Property**

33.     The Departing Senior Employees all agreed to be bound by substantially similar provisions requiring the return of Guy Carpenter property upon the termination of their employment:

Return of Materials Upon Termination of Employment.

Immediately upon the termination of employment with the Company for any reason, or any time the Company so requests, Employee will return to the Company:

(a) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in my possession or control which contain or pertain to Confidential Information; and

---

[5]   The Agreements executed by Jameson, Beard, Durbin, and Wilson define "Confidential Information" to include "any and all information in whatever form relating to the Company or any client or prospective client of the Company." Exs. A–D § 3.  The Agreement executed by Goeke similarly defines "Confidential Information" as "items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its or their great effort and expense."  Ex. E § 3.

(b) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

Employee agrees that upon his/her completion of the obligations set forth in this Section 4, paragraphs (a) & (b) above and if requested by the Company, Employee will execute a statement declaring that s/he has retained no property of the Company or materials containing Confidential Information nor has supplied the same to any person, except as required to carry out his/her duties as an employee of the Company.

Exs. A–D (Jameson, Beard, Durbin, Wilson) § 4; *see also* Ex. E (Goeke) § 4 (similar).

**The Agreements Are Enforceable and Necessary to Protect Guy Carpenter's Business**

34.    The Departing Senior Employees agreed that the restrictions set forth in the Agreements are "vital to protect [Guy Carpenter's] business interests," "reasonably drawn to this end," and "supported by adequate consideration."

Employee acknowledges and agrees that the restrictions set forth in this Agreement are vital to protect the Company's legitimate business interests (including the protection of its Confidential Information and customer goodwill); are reasonably drawn to this end with respect to duration, scope, and otherwise; are not unduly burdensome; are not injurious to the public interest; and are supported by adequate consideration….

Exs. A–D (Jameson, Beard, Durbin, Wilson) § 7(c); *see also* Ex. E (Goeke) § 7(c) (similar).

35.    The Agreements also make clear that if the Departing Senior Employees violate any provision of the Agreements, it would result in "irreparable injury" to Guy Carpenter:

In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, Employee acknowledges and consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to specific performance of such obligations and to temporary and permanent injunctive relief to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee. The Company and Employee agree that in the event the Company seeks injunctive relief based on a breach of this Agreement, bond in the amount of $1,000 shall be adequate security for such injunctive relief.  The prevailing party shall be entitled to reasonable attorneys' fees and costs (including reasonable expert witness fees), in addition to any other relief granted, incurred in any legal action arising under this Agreement.

Exs. A–D (Jameson, Beard, Durbin, Wilson) § 7(c); *see also* Ex. E (Goeke) § 7(c) (similar).

36.    Although the Departing Employees were at-will employees, most of their Agreements, including those of all the Departing Senior Employees, provide that they could only terminate their employment upon providing Guy Carpenter 60 days' notice (the "notice period"). *See* Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke) § 1(a).  The Agreements make clear that during the notice period, they "remain obligated to perform any or all of [their] regular job duties" and "remain an employee of the Company with all attendant fiduciary duties, including, without limitation, his/her duties of loyalty and confidentiality to the Company."  Exs. A–E (Jameson, Beard, Durbin, Wilson, Goeke) § 1(b).

**Jameson, Beard, Durbin, and Wilson's Restricted Covenant Agreements**

37.    In addition to the Agreements described above, four of the five Senior Departing Employees—specifically, Jameson, Beard, Durbin, and Wilson—also entered into multiple Restricted Covenant Agreements during the course of their employment, generally tied to the grant of restricted stock units.  In order to receive the restricted stock units, these employees agreed to be bound by the "Restrictive Covenant Agreement (RCA) . . . provided . . . as part of [the] award documents."  *See* Exs. F–I (2021 Restricted Stock Unit Agreement for Jameson, Beard, Durbin, Wilson).   These agreements contain identical restrictions related to the direct or indirect solicitation of clients and Guy Carpenter employees, and make clear that the obligation not to solicit Guy Carpenter employees applies both during and after their employment with Guy Carpenter:

Restrictive Covenants: Clients

(a) The Employee acknowledges and agrees that solely by reason of employment by the Company, the Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients and have access to Confidential Information (as defined below) and trade secrets relating thereto, including those regarding the Company's clients, prospective clients and related

information, and will have access to and the benefit of goodwill developed by the Company with its clients.

(b) Consequently, the Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Paragraphs 2(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which the Employee obtained Confidential Information or trade secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between the Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the making of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a "prospective" client means interaction between the Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this provision has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

<u>Restrictive Covenants: Employees</u>

The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into contact with and acquire Confidential Information and trade secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained Confidential Information to leave employment with the Company.

Ex. J. §§ 2–3.

38.     These Restrictive Covenant Agreements also prohibit the use or disclosure of confidential and trade secret information:

<u>Restrictive Covenants: Confidentiality And Non-Disparagement</u>

(a) The Employee agrees that he or she will not, during his or her employment with the Company, or at any time after such employment terminates, use for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company) any Confidential Information.

Ex. J § 4(a).

39.     In addition, the Restrictive Covenant Agreements require Jameson, Beard, Durbin, and Wilson to return Guy Carpenter property upon the termination of their employment:

Immediately upon the termination of employment with the Company for any reason, or any time the Company so requests, Employee will return to the Company:  (i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in the Employee's possession or control which contain or pertain to Confidential Information or trade secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.  The Employee agrees that upon completion of the obligations set forth in this subparagraph, and if requested by the Company, Employee will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information nor has he or she supplied the same to any person, except as required to carry out his/her duties as an employee of the Company.  A receipt signed by an Officer of the Employer itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

Ex. J § 4(b).

40.     Jameson, Beard, Durbin, and Wilson were highly compensated through the restricted stock units they were awarded in exchange for their agreement to the terms of their respective Restrictive Covenant Agreements.

41.     Jameson, Beard, Durbin, and Wilson likewise agreed in the Restrictive Covenant Agreements that the restrictions in those agreements are "necessary to protect the legitimate business interests of the Company and are reasonable":

Employee's Acknowledgement

Employee hereby expressly acknowledges and agrees that (a) the restrictions and obligations set forth in and imposed by Sections 2, 3, 4, and 5 will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship; and (b) the restrictions and obligations imposed on Employee under Sections 2, 3, 4 and 5 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration Employee has received or will receive from the Company from each Consideration Event.

Ex. J § 6.

42.     The Restrictive Covenant Agreements also make clear that if Jameson, Beard, Durbin, or Wilson violate any provision of their Restrictive Covenant Agreement, it would result in "irreparable injury" to Guy Carpenter:

Equitable Relief

In recognition of the fact that irreparable injury will result to the Company in the event of a breach by the Employee of his or her obligations under Section 2, 3, 4 or 5 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, the Employee acknowledges, consents, and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by the Employee and persons acting for or in connection with the Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.

Ex. J § 7.

**C.      Howden's Scheme to Raid GC Access and Steal Guy Carpenter's Confidential Information and Clients**

43.     Howden competes with Guy Carpenter in the highly competitive reinsurance broker business.  Howden is based in the United Kingdom and has not historically had a presence in the

United States—including no presence at all in the U.S. MGA market.  Rather than invest time and resources to establish such a presence of its own (as Guy Carpenter did) and compete fairly in the marketplace, Howden, through its principals and agents Richardson, Hubble,[6] and others, hatched an unlawful scheme simply to steal GC Access's employees, clients, and confidential trade secret information.

44.    But Howden could not execute their plan to raid GC Access without help from the inside.  As detailed below, Howden needed assistance from within GC Access to execute its raid of GC Access's employees and clients, actions that Howden knew (or should have known) would cause those insiders to violate their ongoing contractual and fiduciary duties to Guy Carpenter.  Indeed, Howden knew that the coordinated raid would cause the Departing Senior Employees to violate their legal duties to Guy Carpenter specifically because of past enforcement efforts related to similar raids—including lawsuits and settlements related to similar raids of Guy Carpenter.[7]

45.    Beginning in September 2021, Howden's Richardson started to plan the raid by enlisting GC Access's then-President Michael Jameson.  While attending the annual Property

---

[6]    Hubble is employed by Howden Group Holdings, but works as an agent for Howden and Howden US providing human resources services for those entities.

[7]    This team raid strategy comes straight out of Howden's typical playbook.  Guy Carpenter just resolved a similar lawsuit with Howden earlier this year involving Howden's raid of a 30-person Guy Carpenter team.  *See* Adam McNestrie, *Howden and Guy Carpenter settle Maltese poaching dispute*, The Insurer, February 25, 2022, Ex. K.  And earlier this year, Guy Carpenter's competitor Aon sued Howden in the United Kingdom for raiding its construction insurance team.  *Aon sues Howden over UK construction team swoop*, The Insurer, February 1, 2022, Ex. L.  Moreover, in September 2021, Howden raided Guy Carpenter's competitor, Willis Towers Watson's Facultative Reinsurance business taking at least 10 key executives. *Howden's WTW London fac raid reaches double figures*, The Insurer, November 18, 2021, Ex. M.  Similarly, in 2019, Jardine Lloyd Thompson Group (JLT), sued Howden for coordinating the resignation of 47 JLT employees in an effort to gain access to its clients and force the selling off of certain JLT Specialty divisions.  The parties reached a confidential settlement over Howden's employee poaching.  *Hyperion and JLT announce settlement over employee poaching*, Insurance Business Magazine, January 23, 2020, Ex. N.

---

Casualty Insurers Conference in Fall 2021, Guy Carpenter's CEO of North America, John Trace, learned of rumors that Jameson and other employees were engaged in discussions with Howden. When Trace confronted Jameson, he admitted that he had been approached by Howden, but denied any interest in leaving Guy Carpenter to go to Howden.  But, unbeknownst to Guy Carpenter, Jameson was indeed in active negotiations with Howden and would make frequent trips to London in the following months to solidify the deal.

46.     Howden's modus operandi in these situations is to use senior executives to strip out established teams, clients, and confidential information, concealing the moves until it is too late to stop the unlawful recruitment.  That is exactly what happened here.  Howden reached an agreement with the Departing Senior Employees under which they would join Howden US as part of a package deal, bringing along as many top-performing GC Access employees as Howden and the Departing Senior Employees could lure away.  As one of the Departing Senior Employees told another after meeting with Howden, Howden would do "whatever it takes" to "make it work" if "all together" the Departing Senior Employees defected to Howden.

47.     The Departing Senior Employees and Howden utilized confidential personnel data of GC Access employees—including information about compensation, performance evaluations, and client contacts—to target recruits and design offers to entice them to leave Guy Carpenter.

48.     Howden's carefully orchestrated plan also included identifying Guy Carpenter clients, particularly ones with which the Departing Senior Employees had strong relationships, to move their business from Guy Carpenter to Howden.  Identifying and making proposals to these clients necessarily involved the use of Guy Carpenter's confidential information, including information about the clients' current contracts with Guy Carpenter, Guy Carpenter's pricing, Guy Carpenter's business development strategies, and client reinsurance structures and preferences.

49.     At all times while devising this plan with the Departing Senior Employees, Howden was aware of the contractual and fiduciary duties owed by these employees to Guy Carpenter. Indeed, such duties are industry standard in both the United States and the United Kingdom.  And on information and belief, the Departing Senior Employees informed Howden of the contractual obligations they owed to Guy Carpenter—which did nothing to deter Howden's plan to raid GC Access—and Howden was well aware through conversations with the Departing Senior Employees of their roles within GC Access and the attendant common law fiduciary duties associated with those roles.

50.     Howden and the Departing Senior Employees began their efforts to poach other Guy Carpenter employees in January 2022, when the Departing Senior Employees began to discuss the move with several of the Departing Employees.  While these conversations largely took place by telephone, email, and text and/or WhatsApp message, the Departing Senior Employees did at times travel to meet with Howden representatives in London and New York.  For example, in February 2022, a number of the Departing Employees traveled to New York together, where these individuals met with employees of Howden.  On information and belief, the Departing Senior Employees worked with Howden to organize and encourage these trips to New York for the purpose of soliciting these Departing Employees to leave Guy Carpenter for Howden—and to take Guy Carpenter's clients with them.

51.     The Departing Senior Employees actively attempted to destroy evidence that these trips involved meetings with Howden.  For example, Ferrari deleted communications with Departing Senior Employees from his work-issued cell phone in an attempt to hide communications about conspiring with Howden.  Guy Carpenter was only able to recover these

messages through a forensic examination of Ferrari's Guy Carpenter-issued mobile device, which showed evidence of recently deleted messages that Guy Carpenter was able to restore.

52.     The recovered messages show that while Goeke was on a trip to New York in February 2022—months before the April 25 raid—he communicated to Ferrari that his meetings with Howden "went great" and that they "answered every question" he had.  Ferrari responded to Goeke "I think we have to appreciate that there will always be an element of the unknown going into this but from what I understand they get that and ***are willing to do whatever it takes to make it work***.  Nothing will be perfect day one but ***all together we can make it work*** the right way."  Ferrari deleted these messages in an attempt to conceal that he and Goeke were discussing the illicit raid and the plan to "make it work" if "all together" the Departing Senior Employees conspired with Howden to execute the raid.

53.     At Howden's encouragement, the Departing Senior Employees ratcheted up their efforts to recruit GC Access employees in March and April 2022.  The Departing Senior Employees reached out to almost all of the members of the GC Access team in March and April 2022, to solicit them to join Howden with them.  The Departing Senior Employees also provided Howden with GC Access employees' personal contact information so that Howden could further the solicitation by reaching out to them directly.  Richardson and Hubble thereafter initiated and engaged in communications via email, telephone and text and/or WhatsApp messages with the Departing Employees.  And Howden executives like Richardson began offering to fly the Guy Carpenter employees and their spouses to London for "get to know each other" meetings and to discuss the coordinated team move to Howden.

54.     For example, at Howden's direction, Jameson made overtures to fellow GC Access colleagues via telephone and in person.  Jameson recruited current Guy Carpenter employees at an

April 1, 2022, Dallas office happy hour.  He also recruited multiple employees at an April 2022 lunch with junior GC Access employee Arista and another employee during which he spoke to Arista directly about the potential financial opportunities involved with moving to Howden.  At another dinner, Jameson stayed late with a Guy Carpenter employee to tell them about the move and encourage the employee to "trust" him and "stick by" him.  Jameson also recruited Guy Carpenter employees including Matusiak, Skeeter, and Hardee by inviting them to his lake house, where, on information and belief, Jameson discussed the move to Howden and encouraged these employees to follow him.  Moreover, about a month prior to his departure, Jameson contacted a current Guy Carpenter employee to tell her about an opportunity to be a part of something "exciting" and "new," and he later told her that a "majority of us" are leaving.  Shortly after Jameson's first conversation, Howden's Richardson contacted the same employee to discuss specifics about the coordinated move, including compensation.  Richardson mentioned to the employee that a "good portion" of the Dallas office would be moving to Howden.

55.     Similarly, Howden encouraged Beard to contact another current Guy Carpenter employee to tell the employee that Richardson from Howden would be calling them to discuss a "good opportunity."  Beard then told the employee that if they "like what [they] hear, then maybe [they] should join us."  Beard also mentioned that "a few of us are going."  A few hours later, as promised by Beard, Richardson called the employee to talk to them about defecting to Howden.  Hubble later followed up with the same employee about the details of an employment offer.  Even the night before the raid, Beard was continuing to call Guy Carpenter employees, encouraging them to move to Howden and discussing the due diligence he had done on the move before the conspiracy got off the ground.  On information and belief, this was all done at Howden's direction and encouragement.

56.     Howden also used the Departing Senior Employees to gain access to confidential information in order to prepare for its own calls with current Guy Carpenter employees.  For example, in early April 2022, Richardson called multiple Guy Carpenter employees in an attempt to convince them to move to Howden.  Jameson and Beard had previously spoken to these employees in an attempt to convince them to move to Howden, but the employees related a number of reasons for staying with Guy Carpenter.  When Richardson called, he was prepared to address each of these reasons because the Departing Senior Employees—specifically Jameson and Beard—had coached Richardson on the employees' concerns in an effort to help Richardson convince the employees to defect to Howden.  The Departing Senior Employees had also apparently told Richardson who these employees' primary clients were, and Richardson—despite knowing about the employees' non-solicitation restrictions—discussed these clients, and how they could be moved to Howden, on the calls.  On those calls, Richardson told these employees that the "whole team" was leaving for Howden and asked them what would be left if they stayed at Guy Carpenter.

57.     The Departing Senior Employees also provided Howden with detailed insight into the GC Access workforce and told Howden precisely who they should hire and how much they should be compensated.  Indeed, despite many of the Departing Employees having never been recruited or contacted by Howden before, Howden knew exactly how to contact them and which employees to contact because the Departing Senior Employees provided them with this information.  Howden even made offers of employment to certain Departing Employees *without even conducting interviews*, because the Departing Senior Employees had already selected for Howden precisely who should receive offers and on what terms.  The offers Howden made to these employees, despite having never interviewed or asked the employees for their compensation

information, appear to have been based on detailed knowledge of the Departing Employees' salaries and bonuses at Guy Carpenter—again because the Departing Senior Employees provided Howden with this Guy Carpenter confidential information.

58.     The targeted solicitation extended to all facets of the GC Access business.  For example, on information and belief, the Departing Senior Employees focused individual attention—at Howden's direction and encouragement—to solicit Matusiak to join the group raid. Matusiak, an actuary rather than a broker, had specialized knowledge of GC Access's analytics and actuarial services, including the confidential and proprietary tools used for this work, like MetaRisk, described above.  Given his technical, supporting role, Matusiak was valuable to Howden only if Howden's goal was to create a mirror-image of GC Access and the services provided by GC Access through the raid.  Accordingly, the Departing Senior Employees worked with Howden to ensure that Matusiak would be part of the package deal.  Notably, following the resignations, Matusiak claims to have forgotten the password to his work-issued mobile device. On information and belief, this "forgotten password," was another attempt by Matusiak and the Departing Senior Executives to conceal information about their illicit activity.

59.     The Departing Senior Employees' work at Howden's direction—while still on the payroll of Guy Carpenter—was not limited to soliciting Guy Carpenter employees.  In February, March, and April 2022, while employed by Guy Carpenter, these employees also solicited Guy Carpenter clients to move their business to Howden.

60.     For example, the day of the Departing Employees' resignations, a number of Guy Carpenter's MGA clients in the auto insurance industry were attending a conference at the Ritz Carlton hotel in Dana Point, California—the Auto Insurance Report National Conference.  After news of Howden's raid on GC Access broke, the president of a Guy Carpenter client at the

conference bragged that she had known about the departures "for weeks" because Durbin had been discussing the departures with her and asking her to follow him to Howden. The client told a number of people at the convention that she was already planning to move her business to Howden.

61.     Similarly, in March 2022, Durbin and Goeke traveled to London to meet both with Howden and current Guy Carpenter clients. On information and belief, during this trip, Durbin, at Howden's direction, met with a Guy Carpenter client and encouraged the client to cut ties with Guy Carpenter and move to Howden. To add insult to injury, Durbin then sought reimbursement for the entire trip from Guy Carpenter, noting the client meeting. About a month later, on the day before he resigned from Guy Carpenter, Durbin again traveled to London. On information and belief, the purpose of this visit, once again, was to meet with Howden and to convince this client to move its business to Howden. As discussed in more detail below, shortly after the raid, Guy Carpenter received confirmation that this client was moving its business to Howden.

62.     Further, on information and belief, prior to submitting their resignations to Guy Carpenter, the Departing Senior Employees were encouraged by Howden to misappropriate Guy Carpenter confidential information and trade secrets and to use this information to solicit current and potential Guy Carpenter employees and clients to move their business to Howden US.

63.     For example, on March 6, 2022, Jameson accessed the cloud storage application DropBox on his work computer, where on information and belief, Jameson exfiltrated confidential Guy Carpenter information to external cloud storage, where the confidential information could be utilized for Howden US's benefit.

64.     Less than a week before the mass resignations, on information and belief, Durbin accessed, reviewed, and misappropriated highly confidential material saved in a GC Access server folder named "internal," including information about GC Access's client "Prospect Pipeline" and

"MGA Pipeline"—documents detailing particular clients, programs, actual and expected revenue, and other sensitive information about current and prospective clients.  At the same time, Durbin also accessed a number of files related to clients that have now moved their business from Guy Carpenter to Howden.  On information and belief, at Howden's direction, Durbin utilized this confidential information to solicit new business for Howden US.

65.     Additionally, on April 20, 2022, Durbin attempted to forward confidential information to himself related to one of his accounts.  On information and belief, at Howden's direction, Durbin intended to use this confidential information to solicit new business for Howden, including soliciting new co-brokering agreements with parties that Durbin worked with while employed by Guy Carpenter.

66.     In addition, Beard reviewed a number of presentations just a few days prior to his April 25, 2022 resignation, including presentations titled "Startup Playbook—GC Access" and others related to "Growth Strategy."  And on April 20, 2022, just days before resigning, Beard requested access to confidential data detailing Guy Carpenter's valuation of Guy Carpenter's MGAs and brokers, including price and EBITDA.

**D.     Howden Executes The Raid of GC Access**

67.     On April 25, 2022, Howden and the Departing Senior Employees put their covert plan into motion and executed a series of coordinated actions designed to steal GC Access's employees and clients for Howden.

68.     The morning of the raid, Howden's senior executives Richardson and Hubble organized and coordinated an early morning gathering of the U.S. Departing Employees (including Wilson, who was flown in from Atlanta) at a private room in a high-end local Dallas restaurant and hotel.  Howden and the Departing Senior Employees held this meeting to strengthen the resolve of the other Departing Employees and prevent any last-minute changes of heart.  At this

gathering with Richardson and Hubble, the Departing Employees coordinated to draft and send carefully crafted notices of resignation.

69.     Jameson initiated the resignations in the United States when he submitted his resignation to Guy Carpenter CEO John Trace, at 7:32 AM Central Standard Time.  Shortly thereafter, the remaining U.S. Departing Employees, Durbin, Beard, Wilson, Goeke, Hardee, Williams, Skeeter, Brock, Arista, and Matusiak, all submitted similar resignation emails within minutes of each other.  Each of these employees sent their resignations directly to Jameson—despite the fact that not all individuals reported directly to him.

70.     In total, the twelve Departing Employees all submitted their resignations within 34 minutes of one another on the morning of April 25, 2022.  Approximately one hour after receiving the resignation emails of the U.S. Departing Employees, Jameson forwarded each of them to Trace. As the following chart details, the close timing of the resignations makes clear that the exodus of the Departing Employees was carefully coordinated by Howden and the Departing Senior Employees:

| Name | Time of Resignation (CT) |
| --- | --- |
| Michael Jameson | 7:32 AM |
| Kenneth Durbin | 7:38 AM |
| Kyle Goeke | 7:42 AM |
| Andrew Hardee | 7:48 AM |
| Matthew Beard | 7:52 AM |
| Bennett Brock | 7:54 AM |
| James Matusiak | 7:57 AM |
| Barrett Skeeter | 7:57 AM |

| Zachary Wilson | 8:01 AM |
|---|---|
| Mayda Arista | 8:04 AM |
| Oliver Ferrari | 8:06 AM |
| Benjamin Williams | 8:06 AM |
| Caprice Terry[8] | 8:24 AM |

71.     Later that day, the Departing Employees, Richardson, and Hubble had a dinner at a yet-to-be-opened Dallas restaurant, Au Troisième in which Jameson is or was an investor, to celebrate their raid of Guy Carpenter.

72.     In the days immediately following their resignations, Katie Sapienza, North America HR Leader and/or Alex Van Dijk, President – U.S. Branches, spoke with each of the U.S. Departing Employees, except Jameson.  All of these U.S. Departing Employees stated to Sapienza and Van Dijk that they had accepted new positions at Howden.  When asked why they had selected to go to Howden, the U.S. Departing Employees offered the same generic and scripted response. It became clear to Sapienza and Van Dijk that Howden and the Departing Senior Employees had coached the Departing Employees to all deliver the same canned responses.  For example, when some of the Departing Employees were asked to explain what an "entrepreneurial opportunity" means to them—a phrase repeated by multiple Departing Employees—they could not do so.

73.     During the post-resignation interviews between Sapienza and most Departing Employees, the individuals were generally evasive in both scheduling the interviews and answering certain questions during the interviews.   For instance, Jameson rescheduled the

---

[8]     Caprice Terry initially resigned along with the U.S. Departing Employees, but ultimately chose to stay with Guy Carpenter.

interview twice and ultimately refused to meet without his attorney present.  Beard refused to discuss the timeline of events involving his decision to leave, including who approached him.  Durbin admitted to meeting with someone from Howden but refused to provide a name.  Durbin also claimed that he only discussed his potential departure with his wife—even though he resigned at the same time and at the same location as everyone else, an act that was obviously coordinated with the other Departing Employees, and clients had been solicited by Durbin *weeks* before his resignation became public knowledge.  Arista also refused to answer questions on the basis that her attorney (who she admitted was provided to her by Howden) told her not to answer any questions related to Howden.  Williams refused to provide details about who contacted him.

74.     Further, some of the more junior Departing Employees claimed that they were contacted by Howden just days prior to their departure but that they did not know others were leaving to Howden.  This fabricated story made no sense.  Howden did not have an established US presence, so junior employees would only have agreed to move *knowing* that the rest of the team (along with their book of business) would also be moving to Howden.  For this reason and others, it became clear to Sapienza that the junior Departing Employees were part of a coordinated effort led by Howden and the Departing Senior Employees.

**E.     At Howden's Direction, the Departing Senior Employees Misappropriate Guy Carpenter Confidential Information and Unlawfully Induce Guy Carpenter's Clients to Move to Howden**

75.     After tendering their resignations, the Departing Senior Employees were subject to a contractual notice period to remain employees of Guy Carpenter for up to 60 days following their resignations.  The Departing Senior Employees thus remained bound as continuing employees by their duties of loyalty in addition to the various contractual covenants in their Agreements.  Indeed, Guy Carpenter continued to pay the full salaries of the Departing Senior Employees during their notice period until their employment was terminated on May 26, 2022.

76.     Despite these obligations, while they remained employed by Guy Carpenter before their notice periods expired, the Departing Senior Employees were actually *working* on behalf of— and at the encouragement of—Howden.

77.     For example, on the day of the mass resignations, the CEO of a Guy Carpenter client sent an email to Goeke, which explained he had heard a "rumor" that Jameson and "some team" resigned from Guy Carpenter and asked Goeke whether the rumor was true. Goeke responded that he would call the CEO.  On information and belief, Goeke called the CEO and solicited him to move his business from Guy Carpenter to Howden.

78.     On information and belief, the Departing Senior Employees attended a conference hosted by Howden in Del Mar, California in May 2022 while they were still employed at Guy Carpenter.  As discussed above, Howden does not have a presence in the United States, and on information and belief, Howden marketed Guy Carpenter's employees as its representatives during this conference.  The sole purpose for doing so was to solicit new business opportunities for Howden, including in some instances from current or prospective clients of Guy Carpenter.

79.     Further, while still employed by Guy Carpenter, the Departing Senior Employees solicited Guy Carpenter clients to cut ties with Guy Carpenter and take their business to Howden.

80.     For example, *the day after* the Departing Senior Employees submitted their resignation notices to Guy Carpenter, one of Guy Carpenter's clients provided written notice that it was taking its business to Howden.  In a letter dated April 26, 2022, this client stated that, as of the date of the letter, it had appointed Howden Reinsurance Brokers Limited as its Broker of Record following the expiration of its current contract with Guy Carpenter.  Jameson and other Departing Senior Employees were heavily involved in this account at Guy Carpenter.

81.     The timing of this client's move to Howden is no coincidence.  Given that this client moved its business to Howden just one day after the resignations—when the news of the resignations had barely begun to circulate in the trade press and on the market—one or more of the Departing Senior Employees had clearly, at Howden's direction and for its benefit, informed the client prior to their April 25, 2022 resignation of the fact and timing of the teams' plan to leave Guy Carpenter for Howden and had solicited this client to move its business to Howden.

82.     Since then, a number of clients with dozens of specific programs have moved their business from Guy Carpenter to Howden, resulting in millions of dollars in lost revenue to Guy Carpenter.  The first moved the day after the raid, some moved during the Departing Senior Employees' notice period, and others have moved following the Departing Senior Employees' termination from Guy Carpenter.  Each of these clients was serviced by some or all of the Departing Senior Employees while they were employed at Guy Carpenter, and each of the Departing Senior Employees were privy to confidential information about these clients.

83.     Once it became clear that the Departing Senior Employees had violated their fiduciary duties, the Agreements, and the Restrictive Covenant Agreements, and were continuing to do so by actively working to induce Guy Carpenter's clients to leave the Company for Howden, Guy Carpenter took action to contain the harm that the Departing Senior Employees were inflicting on Guy Carpenter.  Between May 24 and 26, 2022, Guy Carpenter elected to end the Departing Employee's notice periods and terminated their employment.  Specifically, the Company terminated Jameson's employment on May 24, 2022; Durbin, Beard, Zach, Goeke, Hardee, Williams, Skeeter, Brock, Arista, and Matusiak's employment on May 26, 2022.[9]

---

[9]   Due to a longer resignation notice period under Ferrari's UK employment agreement, Ferrari remains a Guy Carpenter employee, on garden leave from the company.

84.     Shortly thereafter, all of these individuals formally announced they had assumed substantially similar roles at Howden US, which Howden created and established specifically to employ them.

**F.     At Defendants' Direction, the Departing Senior Employees Continue to Solicit Guy Carpenter Employees and Clients Following Their Termination**

85.     Defendants' efforts to illicitly solicit Guy Carpenter's employees did not end on April 25, 2022, or even after the Departing Senior Employees' terminations in May 2022.  Indeed, Howden and Howden US *continue to this day* to use the Departing Senior Employees to solicit current Guy Carpenter employees to join Howden US, despite unequivocal post-termination obligations prohibiting such actions.

86.     As an example, on the evening of June 9, 2022—following the announcement of a large Howden acquisition in the United States—a number of the Departing Senior Employees were apparently celebrating together.  While gathered, Jameson called a current Guy Carpenter employee, told him he should move to Howden, and asked him why he was still staying at Guy Carpenter.

87.     The Departing Senior Employees have also continued to solicit Guy Carpenter clients on behalf of Howden and Howden US since their termination.  Guy Carpenter has learned that multiple clients are moving their business to Howden after the termination of the Departing Senior Employees as a result of unlawful solicitation by the Departing Senior Employees.  The latest client to depart Guy Carpenter sent a letter informing Guy Carpenter that it was moving its business to Howden on June 30, 2022.   Beard was the primary client contact for this account, but it was also serviced by other Departing Senior Employees, including Durbin.  On April 21, 2022, four days before the coordinated resignations, Beard received an email from the president of this client, asking if Beard was attending the "Boston conference" and saying "let's try to find some

time to connect . . . Drinks &/or Dinner would work for us Monday evening."  While it appears that Beard did not respond to the client through his Guy Carpenter email address, on information and belief, Beard did respond to this client through other means and began to solicit this client to move its business to Howden.  Then, shortly after the Departing Senior Employees' termination, this client sent a letter to Durbin—then a Howden US employee—stating that indeed the client was moving its business to Howden.

88.     As of the date of this filing, Guy Carpenter is aware that the Departing Senior Employees—at Defendants' direction—are actively communicating with multiple Guy Carpenter clients that they serviced while at Guy Carpenter in an attempt to move their business to Howden.  Jameson, Beard, and Goeke set up a meeting with one of these Guy Carpenter clients to discuss new business opportunities, and Beard is currently in active communications—and even having in-person meetings—with another Guy Carpenter client discussing whether they will bring their business to Howden.

89.     The Departing Senior Employees are also telling current and former Guy Carpenter clients that they will continue to service these clients' accounts, even after moving to Howden, despite clear prohibitions of such conduct in the Agreements.  Defendants have encouraged and participated in these continued breaches of the Agreements in order to secure additional new clients for their benefit.

90.     The Departing Senior Employees and Defendants—apparently anticipating that there would be legal action following the illicit raid—have also been telling clients that there would ultimately be a "settlement" between Guy Carpenter and Howden, and that as part of that settlement, the Departing Senior Employees would be permitted to legally continue servicing the

former Guy Carpenter client accounts (in contrast to the *illegal* servicing that is currently taking place).

91.    After the Departing Senior Employees left Guy Carpenter, it has become clear that a number of key confidential, trade secret files are "missing."  Such files include Interest and Liabilities Agreements, which set forth the percentage of risk that each reinsurer has agreed to assume under a given reinsurance policy.

92.    The Departing Senior Employees left behind digital fingerprints of their misconduct.  For example, on April 24, 2022, the day before the mass resignations, Wilson received an automated email from Microsoft with the subject line "Heads up! We noticed that you recently deleted a large number of files from your One Drive."  On information and belief, Wilson deleted a significant number of files from his Guy Carpenter One Drive account, including confidential and trade secret files, on the eve of his resignation in a (failed) attempt to cover up his breaches of his contractual obligations and fiduciary duties.

93.    Since Defendants put their plan to raid Guy Carpenter into motion, over half of the GC Access employees have moved to Howden and numerous GC Access clients with dozens of programs—which collectively generate millions of dollars in revenue annually—have left GC Access, undermining and misappropriating the value of Guy Carpenter's significant investments in building relationships with its clients and immeasurably harming Guy Carpenter's reputation and goodwill in the industry.

## V.  CAUSES OF ACTION

### Count 1: Tortious Interference with Contract
### (Against Defendants Howden and Howden US)

94.    Guy Carpenter incorporates and realleges the preceding paragraphs as if fully set forth herein.

95.     The Departing Senior Employees entered into the Agreements with Guy Carpenter and received consideration for the Agreements in the form of continued employment and access to confidential information belonging to Guy Carpenter.  The Agreements were also ancillary to the Departing Senior Employees' employment agreements with Guy Carpenter and made at the same time as those agreements.  The Agreements include reasonable limitations as to time (*e.g.*, one year post-termination for solicitation of clients and employees), geographic area, and scope of activity.  *See* Exs. A–D (Jameson, Beard, Durbin, Wilson) §§ 2, 3; *see also* Ex. E (Goeke) §§ 2, 3 (similar).  And the Departing Senior Employees and Guy Carpenter agreed that the restrictions on the Departing Senior Employees impose no greater restraint than is reasonably necessary to protect Guy Carpenter's legitimate business interests: "Employee acknowledges and agrees that the restrictions set forth in this Agreement are vital to protect the Company's legitimate busniness interests…"  Exs. A–D (Jameson, Beard, Durbin, Wilson) § 7(c); *see also* Ex. E (Goeke) § 7(c) (similar).  Indeed, the scope of the non-solicitation provisions in the Agreements is necessary to prevent the Departing Senior Employees from soliciting current Guy Carpenter clients and employees within the niche market that GC Access participates in.  The Agreements are valid, enforceable contracts, and Guy Carpenter performed its obligations under the contracts.

96.     At the encouragement and for the benefit of Howden and Howden US, the Departing Senior Employees breached the Agreements by providing Howden (before their termination at Guy Carpenter) and Howden US (after their termination at Guy Carpenter) with Guy Carpenter's confidential information—including knowledge of prospective clients, internal client prospect and revenue lists, current client contractual terms and pricing, client reinsurance structuring information and confidential personnel information—without the consent of Guy Carpenter.  The Departing Senior Employees and Defendants have used such information in order

to target and recruit other Guy Carpenter employees and to interfere with Guy Carpenter's dealings with its current or potential clients in an attempt to solicit their business for Howden (before the Departing Senior Employees' termination at Guy Carpenter) and Howden US (following the Departing Senior Employees' termination at Guy Carpenter).

97.     At the encouragement and for the benefit of Howden and Howden US, the Departing Senior Employees also breached non-solicitation obligations related to current Guy Carpenter employees contained in the Agreements, including by soliciting remaining Guy Carpenter employees following the termination of the Departing Senior Employees' employment with Guy Carpenter.

98.     At the encouragement and for the benefit of Howden and Howden US, the Departing Senior Employees also breached non-solicitation obligations related to current and prospective Guy Carpenter clients contained in the Agreements, including by actively attempting to convince current Guy Carpenter clients to move their business to Howden following the termination of the Departing Senior Employees' employment.  The Guy Carpenter clients and prospective clients that the Departing Senior Employees solicited are clients that they respectively serviced while employed at Guy Carpenter.

99.     At the encouragement and for the benefit of Howden and Howden US, the Departing Senior Employees also breached the return of property provision of the Agreements by failing to return all Guy Carpenter confidential information immediately upon the termination of their employment with Guy Carpenter.

100.     Howden and Howden US knew or had reason to know about the Agreements between the Departing Senior Employees and Guy Carpenter and Guy Carpenter's interest in the

Agreements.  Defendants knew about the Agreements because the Departing Senior Employees provided information about these contractual obligations to Howden and Howden US.

101.    Howden and Howden US willfully and intentionally interfered with the Agreements between Guy Carpenter and the Departing Senior Employees by participating in, encouraging, and inducing the Departing Senior Employees' breaches of the non-solicitation, confidential information, and return of property provisions of the Agreements.

102.    Howden and Howden US's interference proximately caused injury to Guy Carpenter, including through loss of employees in whom Guy Carpenter had invested considerable resources to train and develop, irreparable harm to client relationships and client retention, and damages from lost revenue, lost business and impaired client relationships.

103.    Additionally, Jameson, Beard, Durbin, and Wilson entered into Restrictive Covenant Agreements with Guy Carpenter.  *See* Exs. F–J.  Jameson, Beard, Durbin, and Wilson received substantial considersation for these agreements in the form of restricted stock units and access to confidential and proprietary Guy Carpenter information.  The provisions of the Restrictive Covenant Agreements are subject to reasonable limitations in time, geographic area, and scope of activity.  And Jameson, Beard, Durbin, and Wilson agreed with Guy Carpenter that the restrictions in the Restrictive Covenant Agreements impose no greater restraint than is reasonably necessary to protect Guy Carpenter's legitimate business interests: "Employee hereby expressly acknowledges and agrees that (a) the restrictions and obligations set forth in and imposed by Sections 2, 3, 4, and 5 will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship; and (b) the restrictions and obligations imposed on Employee under Sections 2, 3, 4 and 5 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and

consideration Employee has received or will receive from the Company from each Consideration Event." Ex. J § 6.  Indeed, the scope of the non-solicitation provisions in the Restrictive Covenant Agreements is necessary to prevent the Departing Senior Employees from soliciting current Guy Carpenter clients and employees within the niche market that GC Access participates in.  The Restrictive Covenant Agreements are valid, enforceable contracts, and Guy Carpenter performed its obligations under the contracts.

104.    At the encouragement and for the benefit of Howden and Howden US, Jameson, Beard, Durbin, and Wilson breached their Restrictive Covenant Agreements by providing Howden (before their termination from Guy Carpenter) and Howden US (after their termination from Guy Carpenter) with Guy Carpenter's confidential information—including knowledge of prospective clients, internal client prospect and revenue lists, current client contractual terms and pricing, client reinsurance structuring information and confidential personnel information—without the consent of Guy Carpenter.  Howden (before their termination at Guy Carpenter) and Howden US (after their termination at Guy Carpenter), through Jameson, Beard, Durbin, and Wilson, have used such information in order to target and recruit other Guy Carpenter employees and to interfere with Guy Carpenter's dealings with its current or potential clients in an attempt to solicit their business for Howden and Howden US.

105.    At the encouragement and for the benefit of Howden and Howden US, Jameson, Beard, Durbin, and Wilson breached non-solicitation obligations related to current Guy Carpenter employees contained in their Restrictive Covenant Agreements, including by soliciting remaining Guy Carpenter employees both before their termination at Guy Carpenter, for the benefit of Howden, and after their termination at Guy Carpenter, for the benefit of Howden US.

106.     At the encouragement and for the benefit of Howden and Howden US, Jameson, Beard, Durbin, and Wilson also breached non-solicitation obligations related to current and prospective Guy Carpenter clients contained in the Restrictive Covenant Agreements, including by actively attempting to convince current Guy Carpenter clients to move their business to Defendants, including after the termination of their employment with Guy Carpenter.

107.     At the encouragement and for the benefit of Howden and Howden US, Jameson, Beard, Durbin, and Wilson further breached the Restrictive Covenant Agreements by failing to return all Guy Carpenter confidential information immediately upon the termination of their employment with Guy Carpenter.

108.     Howden and Howden US knew or had reason to know about the Restrictive Covenant Agreements between Jameson, Beard, Durbin, Wilson and Guy Carpenter and Guy Carpenter's interest in the Restrictive Covenant Agreements.

109.     Howden and Howden US willfully and intentionally interfered with the Restrictive Covenant Agreements between Guy Carpenter and Jameson, Beard, Durbin, and Wilson by participating in, encouraging, and inducing Jameson, Beard, Durbin, and Wilson's breaches of the non-solicitation, confidential information, and return of property provisions of their Restrictive Covenant Agreements.

110.     Howden and Howden US's interference proximately caused injury to Guy Carpenter, including through loss of employees in whom Guy Carpenter had invested considerable resources to train and develop, irreparable harm to client relationships and client retention, and damages from lost revenue, lost business and impaired client relationships.

111.    Guy Carpenter has sustained, and will continue to sustain, irreparable harm as a result of Howden and Howden US's tortious interference with the Departing Senior Employees' contractual obligations to Guy Carpenter.

### Count 2: Knowing Participation in Breach of Fiduciary Duty
### (Against Defendant Howden)

112.    Guy Carpenter incorporates and realleges the preceding paragraphs as if fully set forth herein.

113.    While employed at Guy Carpenter, the Departing Senior Employees owed fiduciary duties to Guy Carpenter as their employer.  More specifically, the Departing Senior Employees owed a fiduciary duty to Guy Carpenter not to solicit Guy Carpenter's clients or employees away from Guy Carpenter, or misappropriate Guy Carpenter's business opportunities for the benefit of themselves or competitors.  The Departing Senior Employees breached these fiduciary duties to Guy Carpenter by soliciting Guy Carpenter's clients to take their business to Howden and/or by soliciting Guy Carpenter's employees to leave employment with Guy Carpenter and accept employment with Howden.  Claims related to breaches of these fiduciary duties are actionable torts in any instances in which the breaches do not also constitute breaches of contract (as addressed in Count 1).

114.    Howden was not only aware that the Departing Senior Employees owed these duties to their employer, Guy Carpenter; it was also aware that the Departing Senior Employees were soliciting Guy Carpenter's clients away from Guy Carpenter for the benefit of Howden in breach of these fiduciary obligations.  Howden participated in—and in fact orchestrated—this scheme and was fully aware that it was participating in and encouraging conduct by the Departing Senior Employees that breached their fiduciary duties to Guy Carpenter by soliciting Guy Carpenter clients and usurping Guy Carpenter business opportunities.

115.    Moreover, Howden was also aware that the Departing Senior Employees were soliciting Guy Carpenter's employees to join Howden in breach of their fiduciary duties to Guy Carpenter.  Howden participated in and encouraged these actions and was fully aware that the conduct was in violation of the Departing Senior Employees' fiduciary duties owed to Guy Carpenter including the duty not to interfere with existing employment relationships to the detriment of Guy Carpenter.

116.    The Departing Senior Employees' breaches proximately caused injury—including actual damages—to Guy Carpenter, through the loss and impairment of valuable client and employee relationships, including but not limited to, lost revenue amounting to millions of dollars, and Howden's knowing participation in the breaches contributed to such injuries.

117.    Guy Carpenter has sustained, and will continue to sustain, irreparable harm as a result of Howden's knowing participation in the Departing Senior Employees' breach of fiduciary duties to Guy Carpenter.

### Count 3: Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836
### (Against Defendants Howden and Howden US)

118.    Guy Carpenter incorporates and realleges the preceding paragraphs as if fully set forth herein.

119.    Guy Carpenter owns and possesses certain trade secret information related to its business, as detailed above and as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1839(3).

120.    Guy Carpenter's trade secret information is related to services used, or intended for use, in interstate commerce because Guy Carpenter's business spans the United States.

121.    Guy Carpenter made reasonable efforts to keep such trade secret information secret and confidential, including, but not limited to, (1) requiring that the Departing Employees sign confidentiality agreements covering such trade secrets; (2) requiring its most senior employees to

abide by Restrictive Covenant Agreements related to restricted stock units; and (3) ensuring limited access to the information.

122.    The trade secret information at issue derives independent economic value (actual or potential) from not being generally known to, and not being readily ascertainable though proper means by another person who could obtain economic value from the disclosure of such information.  Guy Carpenter has not consented to disclosure of its trade secret information.

123.    Regarding Guy Carpenter's trade secret information, the Departing Senior Employees' Agreements provide that "[d]uring the period Employee is employed by the Company, Employee agrees that, unless authorized in writing to do so by the chief executive officer of the Company, s/he will not directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out his/her duties as an employee of the Company."  Exs. A–D (Jameson, Beard, Durbin, Wilson,) § 3; *see also* Ex. E (Goeke) § 3(a) (similar).

124.    Through the Departing Senior Employees, Howden (before their termination) and Howden US (after their termination) received Guy Carpenters trade secret information—including information about clients, prospective clients, growth opportunities, competitive pricing, terms and conditions of client contracts, and proprietary information about GC Access's workforce (*i.e.*, information about employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients) without the consent of Guy Carpenter.

125.    Howden and Howden US knew or should have known that Guy Carpenter's trade secret information had been used and disclosed by the Departing Senior Employees by improper means, *i.e.*, through theft and/or a violation of their duty to maintain the confidentiality of the trade secrets because (1) Howden as a sophisticated reinsurance broker, should be familiar with the type

of confidential and trade secret information at issue and the importance of its secrecy; (2) Defendants had access to information regarding the Departing Senior Employees' agreements and the language therein; and (3) the information was not readily available to third parties and highly protected by Guy Carpenter.

126.    Howden (before the Departing Senior Employees' termination) and Howden US (after the Departing Senior Employees' termination) used and benefited from Guy Carpenter's trade secret information through contact with current and potential Guy Carpenter clients in efforts to solicit their business.   Howden and Howden US further used and benefited from Guy Carpenter's trade secret information through contact with Guy Carpenter's employees to solicit them to become employees of Howden US.

127.    Howden's (before the Departing Senior Employees' termination) and Howden US's (after the Departing Senior Employee's termination) unauthorized use of Guy Carpenter's trade secrets, including by using the Departing Senior Employees' access to and knowledge of information about clients, prospective clients, growth opportunities, competitive pricing, terms and conditions of client contracts, and proprietary information about GC Access's workforce to help Howden and Howden US unfairly compete against Guy Carpenter, constituted misappropriation of those trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. Howden and Howden US's misappropriation and use of Guy Carpenter's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

128.    As a direct and proximate result of Howden and Howden US's misappropriation of Guy Carpenter's trade secret information, Guy Carpenter has suffered damages for actual loss caused by the misappropriation, including through lost revenue, lost business opportunities, and harm to client relationships and client prospects.

129.    As a direct and proximate result of Howden and Howden US's misappropriation of Guy Carpenter's trade secret information, Howden and Howden US have been unjustly enriched, and Guy Carpenter is entitled to damages for such unjust enrichment in an amount to be proven at trial.

130.    Unless enjoined by this Court, Howden and Howden US's acts of misappropriation will continue, and Guy Carpenter will continue to suffer irreparable harm as a result of these acts.

131.    Howden and Howden US's misappropriation of Guy Carpenter's trade secret information was willful and malicious.  Guy Carpenter is thus entitled to exemplary damages in an amount up to twice actual damages awarded under 18 U.S.C. § 1836(b)(3)(C).

**Count 4: Violation of Texas Uniform Trade Secrets Act,**
**Tex. Civ. Prac. & Rem. Code §§ 134A *et seq.***
**(Against Defendants Howden and Howden US)**

132.    Guy Carpenter incorporates and realleges the preceding paragraphs as if fully set forth herein.

133.    Guy Carpenter owns and possesses trade secret information related to its business, as detailed above and as defined by Texas Civil Practice & Remedies Code § 134A.002(6).

134.    Guy Carpenter made reasonable efforts to keep such trade secret information secret and confidential, including, but not limited to, (1) requiring that the Departing Senior Employees sign confidentiality agreements; (2) requiring its most senior employees to abide by Restrictive Covenant Agreements related to restricted stock units; and (3) ensuring limited access to the information.

135.    The trade secret information at issue derives independent economic value (actual or potential) from not being generally known to, and not being readily ascertainable though proper

means by another person who could obtain economic value from the disclosure of such information.  Guy Carpenter has not consented to disclosure of its trade secret information.

136.    Regarding Guy Carpenter's trade secret information, the Departing Senior Employees' Agreements provide that "[d]uring the period Employee is employed by the Company, Employee agrees that, unless authorized in writing to do so by the chief executive officer of the Company, s/he will not directly or indirectly, for any purpose whatsoever use, or disclose to any person, Confidential Information, except to the extent required to carry out his/her duties as an employee of the Company."  Exs. A–D (Jameson, Beard, Durbin, Wilson) § 3; *see also* Ex. E (Goeke) § 3(a) (similar).

137.    Through the Departing Senior Employees, Howden (before their termination) and Howden US (after their termination) received Guy Carpenter's trade secret information— including information about clients, prospective clients, growth opportunities, competitive pricing, terms and conditions of client contracts, and proprietary information about GC Access's workforce (*i.e.*, information about employees' relative strengths and potential, various areas of expertise, and relationships with current or potential clients) without the consent of Guy Carpenter.

138.    Howden and Howden US knew or should have known that Guy Carpenter's trade secret information had been acquired and disclosed by the Departing Senior Employees by improper means, *i.e.*, through theft and/or a violation of their duty to maintain the confidentiality of the trade secrets because (1) Howden, as a sophisticated reinsurance broker, should be familiar with the type of confidential and trade secret information at issue and the importance of its secrecy; (2) Defendants had access to information regarding the Departing Senior Employees' agreements and the language therein; and (3) the information was not readily available to third parties and highly protected by Guy Carpenter.

139.     Howden's (before the Departing Senior Employees' termination) and Howden US's (after the Departing Senior Employees' termination) unauthorized use of Guy Carpenter's trade secrets, including by using the Departing Senior Employees' access to and knowledge of information about clients, prospective clients, growth opportunities, competitive pricing, terms and conditions of client contracts, and proprietary information about GC Access's workforce to help Howden and Howden US unfairly compete against Guy Carpenter, constituted misappropriation of those trade secrets in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A *et seq.*  Howden and Howden US's misappropriations of Guy Carpenter's trade secret information was willful and malicious because it resulted from the conscious disregard of Guy Carpenter's rights.

140.     As a direct and proximate result of Howden and Howden US's misappropriation of Guy Carpenter's trade secret information, Guy Carpenter has suffered damages for actual loss caused by the misappropriation, including through lost revenue, lost business opportunities, lost workforce, and harm to client relationships and client prospects.

141.     As a direct and proximate cause of Howden and Howden US's misappropriation of Guy Carpenter's trade secret information, Howden and Howden US have been unjustly enriched, and Guy Carpenter is entitled to damages for such unjust enrichment in an amount to be proven at trial.

142.     Unless enjoined by this Court, Howden and Howden US's acts of misappropriation will continue, and Guy Carpenter will continue to suffer irreparable harm as a result of those acts.

143.     Howden and Howden US's misappropriation of Guy Carpenter's trade secret information was willful and malicious.  Guy Carpenter is thus entitled to exemplary damages in

an amount up to twice actual damages awarded under Tex. Civ. Prac. & Rem. Code §§ 134A.004(b), as well as reasonable attorney's fees.

### Count 5: Civil Conspiracy
### (Against Defendants Howden and Howden US)

144.    Guy Carpenter incorporates and realleges the preceding paragraphs as if fully set forth herein.

145.    Defendants and the Departing Senior Employees were parties to an unlawful combination and conspiracy.

146.    The object of Defendants' and the Departing Senior Employees' combination and conspiracy was to further the unlawful purposes of: (1) breaching fiduciary duties the Departing Senior Employees owed to Guy Carpenter; (2) tortiously interfering with the Departing Senior Employees' contractual agreements with Guy Carpenter; and (3) misappropriating Guy Carpenter's confidential and trade secret information in violation of state and federal law.

147.    The members of this unlawful conspiracy (Defendants and the Departing Senior Employees ) had a meeting of the minds as to the object of the conspiracy.  Defendants and the Departing Senior Employees agreed and understood that the object of their goal was to commit the wrongful acts delineated above.

148.    Particularly, Defendants and the Departing Senior Employees knew that the Departing Senior Employees' conduct of soliciting Guy Carpenter employees and clients (from which Defendants benefitted) was unlawful and in violation of the Departing Senior Employees' fiduciary duties to Guy Carpenter and in direct violation of their contractual agreements.

149.    Defendants and the Departing Senior Employees also knew that the Departing Senior Employees' and Defendants' misappropriation of Guy Carpenter's confidential and trade

information was unlawful and in violation of federal and state law, as well as a violation of their contractual agreements.

150.    Defendants and the Departing Senior Employees formed the specific intent to assist each other in engaging in such conduct to the detriment of Guy Carpenter.

151.    Defendants further committed unlawful, overt acts in furtherance of the conspiracy by unlawfully encouraging and participating in the Departing Senior Employees' solicitation of Guy Carpenter clients and employees both before and following the Departing Senior Employees' terminations and by misappropriating Guy Carpenter's confidential and trade secret information for the benefit of Defendants.

152.    Such unlawful conspiracy proximately caused injury—including actual damages—to Guy Carpenter, including loss of employees in whom Guy Carpenter had invested considerable resources to train and develop, irreparable harm to client relationships and retention, and damages from lost revenue, lost business and impaired client relationships.

153.    Because the acts pursuant to the conspiracy were committed knowingly, willfully, maliciously, fraudulently Guy Carpenter also seeks to recover punitive damages in an amount to be determined at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that the Court:

1. Grant judgment in Guy Carpenter's favor as specified in this Complaint;

2. Award Guy Carpenter its actual damages resulting from Defendants' wrongful acts;

3. Award exemplary damages of twice actual damages awarded under 18 U.S.C. § 1836(b)(3)(C) and Tex. Civ. Prac. & Rem. Code §§ 134A.004(b);

4. Award exemplary damages to Guy Carpenter for Defendants' malicious and willful actions done in conscious disregard of Guy Carpenter's rights under Texas Civil Practice & Remedies Code § 41.003;

5.  Award prejudgment and post-judgment interest and court costs to Guy Carpenter;

6.  Award attorneys' fees to Plaintiff under Tex. Civ. Prac. & Rem. Code § 134A.005, or 18 U.S.C. § 1836(b)(3)(D), or for other reasons in law or equity;

7.  Enter injunctive relief forbidding Defendants from interfering with the Departing Senior Employees' contractual obligations to Guy Carpenter and misappropriating or using Guy Carpenter's trade secrets under the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act;

8.  Grant all other relief to which Guy Carpenter is entitled.

Dated:  August 17, 2022                          Respectfully submitted,

                                                 */s/ Karl G. Nelson*
                                                 Karl G. Nelson
                                                    TX Bar No. 14900425
                                                 Collin D. Ray
                                                    TX Bar No. 24093013
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 2001 Ross Avenue, Suite 2100
                                                 Dallas, TX 75201
                                                 Tel:  (214) 698-3100
                                                 Fax:  (214) 571-2900
                                                 KNelson@gibsondunn.com
                                                 CDRay@gibsondunn.com

                                                 Jason C. Schwartz
                                                    *Pro hac vice application forthcoming*
                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 1050 Connecticut Avenue, N.W.
                                                 Washington, DC 20036
                                                 Tel:  (202) 855-8500
                                                 Fax:  (202) 467-0539
                                                 JSchwartz@gibsondunn.com

Christopher D. Belelieu
*Pro hac vice application forthcoming*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035
cbelelieu@gibsondunn.com

COUNSEL FOR PLAINTIFF
GUY CARPENTER & COMPANY, LLC